**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────────────

**EMIRATES INTERNATIONAL INVESTMENT
COMPANY, LLC,**

               **Petitioner,**

    - against -

**ECP MENA GROWTH FUND, LLC, ET AL.,**

               **Respondents.**
────────────────────────────────────────

**11 Civ. 9227 (JGK)**

**MEMORANDUM OPINION AND
ORDER**

**JOHN G. KOELTL, District Judge:**

This case involves a dispute over an investment that the petitioner, Emirates International Investment Company ("EIIC" or the "petitioner") made with the respondent ECP Mena Growth Fund (the "Fund"). The parties' underlying dispute concerns the decision of the Fund's manager, ECP Growth Management (the "Manager," and collectively with the Fund, the "respondents") to declare EIIC a "defaulting shareholder" because of an allegedly late capital call payment. The petitioner has moved for a preliminary injunction enjoining the respondents from selling the petitioner's portion of the Fund until the underlying dispute is resolved.

The following constitutes the Court's Findings of Fact and Conclusions of Law on this motion.

**I.**

**A.**

EIIC is the largest investor in the Fund, a private equity fund created to invest in the Middle East and North Africa that is managed by the Manager. (See, e.g., Campbell Aff. ¶¶ 3-4.) EIIC pledged $40 million in capital commitments to the Fund in 2007 pursuant to the Shareholders Agreement. (See Campbell Aff. ¶ 3; see also Campbell Aff. Ex. A ("Shareholders Agreement").)

Under the Shareholders Agreement, the Fund may periodically make capital calls requiring the shareholders to contribute capital to the Fund. (See Shareholders Agreement §§ 3.1-3.2.) In 2011, EIIC was late in making a payment on a January 2011 capital call, Capital Call 6, issued by the Manager on behalf of the Fund, although how late is disputed. (Campbell Aff. ¶¶ 10-18 & Ex. D (capital call notice); Wages Aff. ¶¶ 6-24). The parties also dispute how much of the capital call was unpaid. In March, 2011, the Manager represented in an email to EIIC that a distribution from a different fund that was owed to EIIC (the "Africa II Fund distribution") would be applied to Capital Call 6. (See Campbell Aff. Ex. E.) However, there is no dispute that EIIC failed to pay the remaining balance of Capital Call 6 for several months. On April 1, 2011, the Manager sent a letter to EIIC warning EIIC that it would be in default if it did not

pay the balance of Capital Call 6 by April 18, 2011.  (See Campbell Aff. ¶¶ 11-12 & Ex. F (default notice letter).)

Shortly after Capital Call 6 was issued, EIIC was involved in a shareholder effort to terminate the Commitment Period that allowed the Fund to make Capital Calls, to reduce the Manager's fees, and to wind down the Fund, allegedly due to the Fund's poor performance.  (Wages Aff. ¶¶ 9-19.)  The parties dispute whether the shareholders in the Fund ever actually agreed to take these measures, but it is plain that, at a meeting of the Shareholders in early April, the Shareholders did ask the Manager to develop a plan to wind down the Fund, and the Manager represented that it would do so.  (See Doddy Aff. Ex. A (minutes from April 7, 2011 shareholder meeting).)  It is undisputed that EIIC did not pay the balance of Capital Call 6 by April 18, 2011.

On April 19, 2011, the Manager declared an "Event of Default" under the Shareholders Agreement.  (Campbell Aff. Ex. I.)  The next day, upon receiving notice of the Event of Default, EIIC paid what it believed was the unpaid balance of Capital Call 6.  (See Wages Aff. ¶¶ 21-23; see also Campbell Aff. Ex. J.)  On April 27, the Manager sent a Second Default Notice to EIIC, stating that the Africa II Fund distribution had not been applied to Capital Call 6, and that the Manager intended to consider EIIC's entire investment in the Fund

3

forfeited, and to bar EIIC from future shareholder deliberations and distributions. (Campbell Aff. Ex. K.) EIIC then paid the remaining balance on Capital Call 6. (See Wages Aff. ¶¶ 25-29; Campbell Aff. Ex. M.) In May, 2011, EIIC wrote to the Manager to remind the manager that the plan to wind down the Fund was due to the shareholders. The Manager replied that, because EIIC was a defaulting shareholder under the agreement, the Manager could not discuss the issue with EIIC. (Wages Aff. ¶¶ 31-32.)

The parties' underlying dispute thus concerns, among other things, what "defaulting shareholder" status pursuant to the Shareholder Agreement entails: the respondents argue that EIIC's past contributions and future distributions are forfeit; EIIC argues that they are not. The parties are currently engaged in an arbitration proceeding before a tribunal of the International Chamber of Commerce to resolve this dispute. (See, e.g., Ungar Black Supp. Decl. Ex. A (Joint Proposed Arbitration Schedule).)

In December, 2011, while the arbitral panel was still being finalized, EIIC filed this motion by Order to Show Cause for a preliminary injunction pending arbitration, requesting that the Court (1) enjoin the Manager from distributing to the other shareholders EIIC's purported share of distributions from the Fund; and (2) require that EIIC's purported share of any distributions be placed in escrow pending the resolution of the arbitration; and (3) declare EIIC's rights under the

shareholder's agreement to inspect ECP's books.  EIIC also moved for a Temporary Restraining Order, but subsequently withdrew that motion.

**B.**

The Fund is now allegedly in liquidation.  EIIC does not assert that any of the assets of the Fund have been sold since the commencement of this action, but argues that such a sale is imminent.

The Fund purchased five investments in 2008.  (See Broome Supp. Repl. Decl. Exs. D ("SAH Inv. Mem."), E ("BACIM Inv. Mem."), F ("Finaccess Inv. Mem."), G ("Shoresal Inv. Mem."), H ("Agromed Inv. Mem.").)  In its 2008 investment memoranda to the shareholders, the Fund estimated that it would sell these assets between 2010 and 2012.  (See SAH Inv. Mem. at 4, 63 ("primary exit strategy" was 2010 trade sale); BACIM Inv. Mem. at 38-41 (exit expected in "Q1 2012"); Finaccess Inv. Mem. at 52-54 (exit via IPO expected in "Q3 2012"); Shoresal Inv. Mem. at 32 (exit via block sales "starting in April 2010"); Agromed Inv. Mem. at 45 ("Q1 2012").  The Agromed investment was sold prior to the commencement of this litigation, (Nedjar Aff. ¶ 14), and thus four investments remain.

Conditions change.  The world financial markets have experienced considerable turmoil since 2008.  A chart from the

5

Fund's April 7, 2011 shareholder meeting indicates that, by that time, the estimated exits from the remaining investments had been moved back from the initial timetables, with the earliest potential withdrawal time from any of the remaining assets estimated to be in the latter half of 2012.  (Campbell Aff. Ex. O (Apr. 17, 2011 Portfolio Exit Timing chart).)

More recently, the respondents produced credible evidence in this litigation in the form of an affidavit from Manil Nedjar, a managing director with the Manager with day-to-day responsibility for managing the Fund's investments.[1]  Nedjar describes the current status and expected withdrawal dates from the Fund's remaining investments as follows:

In 2008, the Fund made an investment of over $18 million in BACIM Bank, a Mauritanian Bank.  The Fund is the majority owner of BACIM.  (Nedjar Aff. ¶¶ 15-16.)  Nedjar explained that, based

---

[1] EIIC argues that the Court should disregard the Nedjar affidavit because it was submitted during supplemental briefing, after the close of discovery in this case.  However, it was EIIC that submitted an opening supplemental brief, to which respondents responded.  Furthermore, EIIC had the opportunity to reply to the Nedjar affidavit, both in a Reply brief and at oral argument.  The Court therefore need not disregard the affidavit.
   Moreover, EIIC's arguments attempting to undermine the credibility of the Nedjar affidavit are unpersuasive.  EIIC points to the initial investment memoranda from 2008 that show earlier timetables for exiting these investments.  EIIC also argues that, because Nedjar stated that the shareholders are eager to sell certain assets, the respondents likely would sell them earlier than the dates estimated by Mr. Nedjar.  However, the fact that the shareholders would like to sell the assets does not make Nedjar's assessment that the respondents will be unable to sell them because of market conditions less credible.

on current market conditions and various problems with the Bank that were not known when the investment was made, the Fund currently cannot sell its stake in BACIM at a reasonable price. (Nedjar Aff. ¶¶ 17-21.)  Under the current plan for disposing of this investment, an actual transaction would not be made until April 2014.  (Nedjar Aff. ¶¶ 22-23.)

In January 2009, the Fund consummated a $3 million investment in Finaccess, a Moroccan business.  (Nedjar Aff. ¶¶ 24-25.)  The Manager's current plan is to exercise a put option that would allow the Fund to sell back its stake in Finaccess to Finaccess' majority shareholder.  (Nedjar Aff. ¶¶ 26.)  The put option cannot be exercised until April 2013.  (Nedjar Aff. ¶¶ 26.)

In 2008, the Fund purchased a nearly 20% stake in SAH, a Tunisian business.  (Nedjar Aff. ¶¶ 27-28.)  The value of the investment has grown somewhat, but SAH had been adversely affected by the revolution in Tunisia, as well as other market conditions.  (Nedjar Aff. ¶ 29.)  At present, the Fund has no plan in place for exiting the investment and does not see doing so before 2014.  (Nedjar Aff. ¶ 30.)

In 2009 the Fund purchased a 91% stake in Shoresal, an Algerian property developer.  (Nedjar Aff. ¶ 31.)  According to Nedjar, the Fund cannot seek an exit from Shoresal investment until the second quarter of 2013, because additional financing

7

and development of Shoresal's projects are needed before the investment can be sold for any value. (Nedjar Aff. ¶¶ 32-36.)

Nedjar further explained that he prepared the chart from the April 7, 2012 shareholder meeting, and credibly explained why the somewhat earlier exit estimates in that document are consistent with his testimony.  Specifically, while the April 7, 2011 chart indicated that the earliest sale date for the Shoresal investment would be April 2012, "prior to the construction of the office tower" that Shoresal was developing, (Campbell Aff. Ex. O.), Nedjar's affidavit explains that the investment cannot be profitably sold until the tower is 20% complete, because under local law Shoresal will not have title to the property until then.  (Nedjar Aff. ¶ 40.)

There is evidence that the Fund <u>could</u> liquidate some of these assets during the pendency of the arbitration, inasmuch as the Fund may not be under any legal obligations not to do so. (<u>See, e.g.</u>, Broome Supp. Decl. Ex. 1 ("Campbell Dep. Tr."), at 124) (stating that assets could be sold "at any time."). However, no evidence of any imminent sales has been produced in this litigation.  EIIC points to emails that purport to indicate otherwise, but none of these emails indicate that any sales are imminent.  For example, EIIC points to a draft email circulated by Nedjar in December, 2011 that states that "we are likely to enter into due diligence/negotiations for financing or sale [of

8

the Shoresal investment] in the coming month."  (Broome Supp. Decl. Ex. 2.)  However, this email predates Nedjar's more recent testimony.  Moreover, there is no evidence that such negotiations ever occurred.  The purpose of the email was to encourage another shareholder to make its full capital call payment, and not to opine on the actual possibility that the asset would be sold.

In addition, EIIC has failed to establish that there is any likelihood any asset sales would be available for distribution to shareholders, because the Fund may not make distributions until its equity to debt ratio is greater than 2:1, pursuant to its financing agreement with the Overseas Private Investment Corporation ("OPIC").  (See Summerfield Aff. ¶¶ 6-7.)  According to the Fund's controller, the Fund's current equity to debt ratio is less than 1:1.  (Summerfield Aff. ¶¶ 8-9.)

**II.**

**A.**

Before considering the merits of EIIC's motion for a preliminary injunction, there is an initial issue of subject matter jurisdiction.  EIIC initially asserted, and the defendants did not contest, that this action was properly in federal court on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332.  However, the parties now concede that there

is no diversity in this case, because both the petitioner EIIC and the Fund are aliens.  See Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 790 (2d Cir. 1980) ("[T]he fact that alien parties were present on both sides would destroy complete diversity.").  The parties nevertheless urge that the Court may consider the merits of the motion.

**A.**

The petitioner argues that the lack of complete diversity can be remedied by dropping the Fund as a respondent, which would preserve diversity jurisdiction.  The petitioner argues that the Fund is not a necessary party and that the Court can order the injunctive relief sought by the petitioner solely as against the Manager.

The petitioner relies on CP Solutions PTE, Ltd. v. General Electric Co., 553 F.3d 156 (2d Cir. 2009) (per curiam).  Under CP Solutions, Rule 19(b) of the Federal Rules of Civil Procedure governs the question of whether a defendant may be dismissed from the case in order to maintain complete diversity.  Id. at 159 (citing Curley v. Brignoli, Curley & Roberts Assocs., 915 F.2d 81, 89 (2d Cir. 1990)).  "Rule 19(b) specifies four factors: (1) whether a judgment rendered in a person's absence might prejudice that person or parties to the action, (2) the extent to which any prejudice could be alleviated, (3) whether a

10

judgment in the person's absence would be adequate, and (4) whether the plaintiff would have an adequate remedy if the court dismissed the suit." Id.

The first two factors deal with the potential prejudice either to the Fund or other parties, and there is little evidence to support a finding of prejudice. The Fund and the Manager have the same counsel, and it is therefore likely that "counsel for those remaining in the case will be no less vigorous in their advocacy because they represent . . . fewer persons." Id. at 160 (quoting Prescription Plan Serv. Corp. v. Franco, 552 F.2d 493, 497 (2d Cir. 1977)).

The second two factors counsel against the permissibility of dropping the Fund. With regard to the adequacy of an injunction solely as against the Manager, such an injunction would not serve the "social interest in the efficient administration of justice and the avoidance of multiple litigation." Id. (quoting Republic of Philippines v. Pimentel, 553 U.S. 851, 870 (2008)). If this Court were to enjoin only the Manager, EIIC might still have to proceed separately, in another forum, against the Fund. It is the Fund whose assets are at issue in this case, and the Fund has the capacity to fire the Manager.

Moreover, there is plainly an adequate remedy in this case if the action is dismissed: the arbitral tribunal, which is

11

currently constituted, and which has the power to enjoin the parties before it.

Ultimately, it would make little sense to dismiss the Fund as a dispensable party, particularly given that the petitioner's entire rationale for bringing this action is its fear of "having nothing but monetary relief against two defendants who don't have the liquidity to cover the judgment." Dec. 21 Oral Arg. Tr. at 15. Unlike in CP Solutions, the party whose dismissal is urged is not a defunct shell, a "nonexistent or dissolved entity." 553 F.3d at 158. It is the owner of the assets in dispute.

### B.

The respondents argue that subject matter jurisdiction exists pursuant to Chapter 2 of the Federal Arbitration Act, 9 U.S.C. § 201 et seq., which makes the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") enforceable in federal courts.

Under Chapter 2, "[a]n action or proceeding falling under the [New York] Convention shall be deemed to arise under the laws and treaties of the United States." 9 U.S.C. § 203. Under Chapter 2, "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract,

12

or agreement described in section 2 of this title, falls under the Convention." Id. at § 202.  Chapter 2 excludes an agreement or award arising out of such a relationship that is entirely between citizens of the United States unless it involves certain other international aspects.  Id.  Chapter 2 specifically provides district courts with the power to compel arbitrations, id. at § 206, and to confirm arbitration awards, id. at § 207.

The law in this Circuit is somewhat unclear on the specific question of whether a petition for preliminary injunctive relief pending an arbitration otherwise covered by the New York Convention is an action or proceeding falling under the New York Convention.  See Goel v. Ramachandran, --- F. Supp. 2d ----, No. 10 Civ. 8916, 2011 WL 4717361, at *9 (S.D.N.Y. Sept. 26, 2011) (collecting cases).  There is authority for the proposition "that a federal court only has jurisdiction under the New York Convention to either compel arbitration or confirm an arbitral award."  Id.; see also, e.g., International Shipping Co., S.A. v. Hydra Offshore, Inc., 675 F. Supp. 146, 153 & n. 48 (S.D.N.Y. 1987) ("Because this case involved neither an action to compel arbitration nor enforcement of an arbitral award, the Court found that it did not have subject matter jurisdiction pursuant to the Convention."), aff'd, 875 F.2d 388 (2d Cir. 1989).  In this case, there is no application to compel arbitration or to

confirm an award because the underlying arbitration is currently proceeding.

However, there is also authority "indicat[ing] that a district court's power under the Convention is broader," "recognizing a court's power to entertain requests for provisional remedies in aid of arbitration even where the request for remedies does not accompany a motion to compel arbitration or to confirm an award," and awarding interim relief very similar to the relief sought here. Venconsul N.V. v. Tim Intern. N.V., No. 03 Civ. 5387, 2003 WL 21804833, at *2-3 (S.D.N.Y. Aug. 6, 2003); see also Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 391 & n.6 (2d Cir. 2011) (concluding that the New York Convention is enforceable not "only where the party invoking its provisions seeks 'either to compel arbitration or to enforce an arbitral award,'" but also "where a court acts to protect its prior judgments by staying incompatible arbitral proceedings otherwise governed by that Convention.") (citation omitted).

Because the motion for a preliminary injunction lacks merit and should be denied, the Court need not conclusively reach the issue of the scope of subject matter jurisdiction. See Bulgartabac Holding AD v. Republic of Iraq, 451 F. App'x 9, 12 (2d Cir. 2011) (summary order); Berman v. Turecki, 885 F. Supp. 528, 536 (S.D.N.Y. 1995).

### III.

The standards that govern the issuance of a preliminary injunction are well established. Ordinarily, a party seeking a preliminary injunction must show: "(1) a likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor." Doninger v. Niehoff, 527 F.3d 41, 47 (2d Cir. 2008).

"To satisfy the irreparable harm requirement, [petitioner] must demonstrate that absent a preliminary injunction [it] will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005) (quoting Rodriguez v. DeBuono, 175 F.3d 227, 234-35 (2d Cir. 1999)). "Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction. Accordingly, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." Id. (citation and alteration omitted).

The burden is on the petitioner.

Here, EIIC has not demonstrated any likelihood of irreparable harm.  EIIC argues that there is a "substantial possibility" that distributions by the Fund are likely to occur prior to the conclusion of the arbitration in 2013.  While the Fund has the power to sell its assets, EIIC has failed to show that there are any active negotiations for the sale of any of the assets, that a specific buyer has been identified, or that a transaction of any kind is imminent.  Moreover, after any assets were sold, the Fund would not be able to make distributions due to its agreement with OPIC.  Finally, the parties are actively engaged in an arbitration before respected arbitrators who have the ability to monitor the state of the assets.  Under these circumstances, a preliminary injunction is not justified.  See Vantico Holdings S.A. v. Apollo Management, LP, 247 F. Supp. 2d 437, 452 (S.D.N.Y. 2003) ("[T]he mere possibility of harm is insufficient to justify granting a preliminary injunction.")

Furthermore, the petitioner has failed to show that any sales of assets would result in irreparable injury.  This is a dispute about money and to the degree that the arbitrators eventually find that the petitioner is entitled to some award, there is no showing that the petitioner cannot be made whole through money damages.  See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 333 (1999).  The mere

16

possibility that distributions might occur at some point before the arbitral panel has ruled is too remote and too speculative to warrant the issuance of a preliminary injunction.

Because EIIC has not met its burden of showing that an injury to it is "actual and imminent," the requirements for a preliminary injunction have not been met in this case. <u>Freedom Holdings</u>, 408 F.3d at 114. The motion for a preliminary injunction is **denied**.

### CONCLUSION

The Court has carefully considered all of the parties' arguments. To the extent not specifically addressed above, they are either moot or without merit. For the reasons stated above, the petitioner's motion for a preliminary injunction is **denied**.

SO ORDERED.

Dated: New York, New York
June 14, 2011

John G. Koeltl
United States District Judge